**Eloise Pepion COBELL, et al., Plaintiffs,**

**v.**

**Bruce BABBITT, Secretary of the Interior,**

**Robert Rubin, Secretary of the Treasury, and**

**Kevin Gover, Assistant Secretary of the Interior, Defendants.**

**No. Civ. 96–1285 RCL.**

United States District Court, District of Columbia.

June 7, 1999.

---

12

See also: 30 F.Supp.2d 24, 37 F.Supp.2d 6.

14

Dennis M. Gingold, Washington, D.C., Thaddeus Holt, Point Clear, Alabama, Elliott H. Levitas, Atlanta, Georgia, Keith Harper, Lorna K. Babby, Washington, D.C., for plaintiffs.

Lois J. Schiffer, Assistant Attorney General, Tom C. Clark, II, Senior Counsel, Phillip A. Brooks, Senior Counsel, Charles Findlay, Assistant Chief, U.S. Department of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

### I. *Introduction*

This matter comes before the court on Defendants' Motion for Summary Judgment on Plaintiffs' Claims Based Upon a Common Law Breach of Trust Theory, Claims Based Upon Alleged Interference with the Office of Special Trustee, and Requests for a Mandatory Injunction [1]; and Defendant Secretary of the Treasury's Motion [262] for Summary Judgment. Upon consideration of these motions and

---

1. For ease of reference, the court will refer to this motion, which all defendants join, as "Defendants' Consolidated Motion for Summary Judgment."

the applicable law, the court will DENY both motions.

This lawsuit involves the federal government's handling of the Individual Indian Money (IIM) trust.[2] The IIM trust has much in common with a standard common-law trust. Like other trusts, the IIM trust was created by the settlor with the intent to hold income generated by the trust corpus, in this case individual Native American land allotments, in trust for the benefit of its beneficiaries, who are all Native American individuals. In general terms, the trust income is generated from the mineral, agricultural, and timber leases of these land allotments. Federal law allows these monies to be deposited with the Department of the Treasury and requires these funds to be properly invested, at the discretion of the Secretary of the Interior. *See* 25 U.S.C. § 161; 25 U.S.C. § 161a(b); 25 U.S.C. § 162a.

The IIM trust also has several features that distinguish it from the standard common-law trust. First, the federal government acts as settlor and trustee of the trust. In 1887, Congress statutorily authorized the holding of Native American allotments in trust. *See* General Allotment Act § 5, 25 U.S.C. § 331 *et seq.* As described more fully below, this act marked the beginning of the government's pervasive federal control over Native American allotments and, more importantly for the purposes of this case, the funds that these allotments generated. Second, the creation of this trust and the inclusion of the trust corpus into the trust appear to have rested more upon the plenary power

of the sovereign than the will of the beneficiaries, as can be seen from the unique history surrounding the establishment of the IIM trust relationship between Native Americans and the government.[3]

Around the turn of the 19th Century, the growth of the United States created a demand for territorial expansion. This demand ushered into government the original policy of the "voluntary" extinguishment of Native American title, usually accomplished through treaties. The original period of expansion eventually led to the removal of native tribes to the western territories and, shortly thereafter, to the reservation system. It goes without saying that this policy created serious disputes between the government and the Native American people. In the mid-1850s, the government shifted away from its policy of apportioning reservation lands to tribes and began to experiment with "allotment" of tribal lands, the mechanism by which tribal ownership would be converted into title equitably held by Native American tribe members. This experiment was the precursor to the trust policy that exists to this day.

In short, and most importantly for the purposes of this case, the federal government kept legal title of these individual allotments, in trust, for the benefit of the equitable owners who are the plaintiffs in this case. This period of limited trusteeship by the government was originally set for 25 years in the General Allotment Act. *See* 25 U.S.C. § 348. The period was later extended indefinitely by the Indian Reor-

2. For a more exhaustive description of the facts in this case, *see Cobell v. Babbitt*, 37 F.Supp.2d 6 (D.D.C.1999) (adjudging and decreeing defendants to be in contempt of court); *Cobell v. Babbitt*, 30 F.Supp.2d 24 (D.D.C.1998) (addressing defendants' motion to dismiss).

3. The court will not recount in depth the history of the relationship between Native Americans and the government. However, a brief rendition is warranted to provide a context for how this trust came into existence. This background has influenced the develop-

ment of federal Indian law throughout this nation's history. *See generally* FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 47–206 (1982). In the words of one commentator, "the unique relationship between the United States and the Indians [reveals] the underpinnings of the government's fiduciary duty which are essential to an intelligent analysis of the breach of trust cases." Reid Peyton Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians*, 27 STAN L.REV. 1213, 1215 (1975)

ganization Act of 1934, 25 U.S.C. § 462. Although the government in the past four decades has moved toward a policy of self-determination, *see* 25 U.S.C. § 450 *et seq.*, which is premised on the idea that Native American tribes are the basic governmental units of Native American policy, the IIM trust system of individual land allotments and proceeds therefrom still remains an area of pervasive and complete federal control.

Complete federal control over the IIM system is established by statute.[4] Among other duties, the Secretary of the Interior must collect trust income from the leases of the allotments, *see* 25 U.S.C. § 162a(d)(1), direct the investment of trust fund monies in public debt securities held by the United States Treasury, *see* 25 U.S.C. 162a(b), deposit and invest trust fund monies outside of the United States Treasury, *see* 25 U.S.C. § 162a(a) & (c), maintain and perform the accounting on the IIM accounts for the individual Indian beneficiaries, 25 U.S.C. § 162a(d)(3) & (5), provide periodic account statements to beneficiaries, *see* 25 U.S.C. § 162a(d)(5), and disburse funds to the beneficiaries, *see* 25 U.S.C. § 162a(d)(2). The Department of the Interior has "exercised its comprehensive responsibilities in issuing extensive regulations to complement this legislative scheme." Department of the Treasury's Motion at 17 (citing 25 C.F.R.Pt.115). In furtherance of the discharge of these fiduciary obligations, Congress has authorized the Secretary of the Interior to deposit IIM funds with the United States Treasury. *See* 25 U.S.C. § 161. The Secre-

tary of the Treasury is authorized to invest these funds, at the discretion of the Secretary of the Interior, subject to certain statutory requirements. *See* 25 U.S.C. § 161a. In short, Congress has statutorily provided the Secretary of the Interior and, to a more limited extent, the Secretary of the Treasury, with several specific fiduciary duties that pertain to the IIM trust.[5]

The management of the Native American trusts, including the IIM trust, has been the subject of much public criticism from the beginning. It is reported that in 1828, Henry Rows Schoolcraft, a negotiator of Indian treaties and a novelist, said of the Native American trusts that "[t]he derangements in the fiscal affairs of the Indian department are in the extreme. One would think that appropriations had been handled with a pitchfork . . . . There is a screw loose in the public machinery somewhere." *See* H.R.Rep. No. 103–778 (1994).

Congress has not been impressed with defendants' handling of the IIM trust fund in the 171 years subsequent to Schoolcraft's comments. In the words of a 1992 congressional report of the Environment, Energy, and Natural Resources Subcommittee of the House of Representatives:

> Scores of reports over the years by the Interior Department's inspector general, the U.S. General Accounting Office, the Office of Management and Budget, and others have documented significant, habitual problems in BIA's ability to fully and accurately account for trust fund moneys, to properly discharge its fidu-

---

4. Primary responsibility for the discharge of the United States' general fiduciary obligations has been given to the Secretary of the Interior. Congress has, however, authorized the Secretary of the Interior to delegate a few of his responsibilities, including holding and investing certain funds, to the Secretary of the Treasury. It should be kept in mind that, unless otherwise specified by Congress, it is ultimately the United States that owes fiduciary duties to the Native Americans. As explained below, these fiduciary obligations arise in certain circumstances from statutes and regulations evincing the federal govern-

ment's pervasive federal control over Native American affairs. These fiduciary obligations do not arise, at least at first instance, from any power originating with the Secretary of the Interior or the Secretary of the Treasury.

5. The Bureau of Indian Affairs historically has been tasked by the Secretary of the Interior with the day-to-day management of the IIM trust. As discussed below, however, BIA was stripped of this responsibility in terms of financial management in 1994. BIA still manages the trust assets.

ciary responsibilities, and to prudently manage the trust funds.

Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund, H.R. No. 102–499 (1992). Congress was "particularly troubled by BIA's efforts—undertaken only grudgingly—to implement repeated congressional directives designed to provide a full and accurate accounting of the individual ... account funds." *See id.* In short, almost every entity, governmental or otherwise, tasked with the assessment of the IIM trust has found serious accounting and financial management problems.

In 1994, as a result of the BIA's failures in the management of this trust fund, Congress codified some of the government's duties with regard to this IIM trust system. Section 101 of the Indian Trust Fund Management Reform Act, 25 U.S.C. § 162a(d), provides a non-exclusive list of the Secretary of the Interior's obligations in properly discharging the United States' trust responsibilities to IIM beneficiaries:

(d) Trust responsibilities of Secretary of Interior

The Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following:

(1) Providing adequate systems for accounting for and reporting trust fund balances.

(2) Providing adequate controls over receipts and disbursements.

(3) Providing periodic, timely reconciliations to assure the accuracy of accounts.

(4) Determining accurate cash balances.

(5) Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis.

(6) Establishing consistent, written policies and procedures for trust fund management and accounting.

(7) Providing adequate staffing, supervision, and training for trust fund management and accounting.

(8) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands.

25 U.S.C. § 162a(d). As can be seen from the face of this enactment, seven of the eight specific, statutorily mandated trust duties deal directly and unambiguously with providing the IIM beneficiaries an accounting of the IIM trust.

Section 162a was not the only statute passed placing trust duties on the federal government. 25 U.S.C. § 4011 also provides, under the caption "Recognition of Trust Responsibility," as follows:

§ 4011. Responsibility of Secretary [of the Interior] to account for the daily and annual balances of Indian trust funds.

(a) Requirement to account

The Secretary shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to [25 U.S.C. 162a].

(b) Periodic statement of performance

Not later than 20 business days after the close of a calendar quarter, the Secretary shall provide a statement of performance to each Indian tribe and individual with respect to whom funds are deposited or invested pursuant to [25 U.S.C. 162a]. The statement, for the period concerned, shall identify—

(1) the source, type, and status of funds;

(2) the beginning balance;

(3) the gains and losses

(4) receipts and disbursements; and

(5) the ending balance.

25 U.S.C. § 4011 (Supp.1999). Thus, the federal government's trust duty to provide an accounting is provided for by statute and mandated by Congress in a detailed fashion.

Congress did not believe that the Indian Trust Fund Reform Act was the original source of the government's fiduciary obligations under the IIM trust, and surely it was not. For example, the 1992 subcommittee report discussed above, which predated by two years the Indian Trust Fund Management Reform Act, stated:

> The most fundamental fiduciary responsibility of the government, and the Bureau [of Indian Affairs], is the duty to make a full accounting of the property and funds held in trust for the 300,000 beneficiaries of the Indian trust funds. This function includes the continuing obligation to report to the tribes and individual account holders about the Federal Government's management of the trust funds.

See Misplaced Trust, H.R. No. 102–499. Congress passed the Indian Trust Fund Management Reform Act to further codify and solidify some of defendants' fiduciary obligations. Importantly, the act primarily codified the narrow issue involved in this case and the ultimate relief sought by plaintiffs—an accounting of their trust fund money.

In its most recent attempt to force defendants to come into compliance with the law, Congress created another entity, placed outside of the BIA, to try to implement and oversee the trust administration process. See 25 U.S.C. § 4041 et seq. This entity, the Office of the Special Trustee for American Indians, was to be headed by the Special Trustee, a sub-cabinet level official appointed by the President and confirmed by the Senate. See 25 U.S.C. 4042(b)(1). The Special Trustee was given three statutory directives, all of which require him to ensure the effective management and discharge of the Secretary of the Interior's established trust responsibilities. Since the passage of this statute, the Secretary of the Interior has, without the approval of Congress, re-organized the Office of the Special Trustee, thereby forcing the Special Trustee to resign and prompting the reassignment of the Special Assistant to the Special Trustee. All of this action was taken by Secretary Babbitt and his high-ranking employees without conferring with the Special Trustee beforehand.[6] There is currently no Special Trustee in place, and, to the court's knowledge, the Acting Special Trustee, Thomas Thompson, does not meet the statutory requirements for the job. See 25 U.S.C. § 4042(b)(1). The court is not aware of any appointment that has been made to fill this position.

Despite the creation of the Office of the Special Trustee five years ago and repeated congressional directives for well over a half-decade, the government is still unable to provide plaintiffs with an accounting of their money. Plaintiffs have attempted to have their fiduciary duties enforced by Congress, but to no avail. Congress has not been able or willing to force defendants to come into compliance with their fiduciary obligations—most fundamentally the statutory obligation to provide plaintiffs an accounting—notwithstanding numerous hearings, codifications, and the creation of a special entity to help spur change in this regard. In plaintiffs' view, defendants have acted in derogation of their clear legal duties and have been allowed to remain above the law. The Native American beneficiaries of the IIM trust have now turned to the judicial branch for relief. Plaintiffs have brought suit to enforce their rights arising from the IIM trust. According to plaintiffs, these rights are provided for under an amalgam of the statutes already discussed and, to a certain limited extent, the common law.[7]

---

6. Senator Ben Nighthorse–Campbell has offered an amendment to the Supplemental Appropriations Bill stating that no funds may be used to enforce defendant Babbitt's executive order, which restructured the Office of the Special Trustee. See Plaintiffs' Opposition o Defendants' Consolidated Motion, Ex. 1.

7. The court has already held that plaintiffs state claims under the theories of "statutory" (i.e., under the Administrative Procedure Act,

The court has bifurcated the proceedings before it. The first phase of the case involves plaintiffs' claims for declaratory and injunctive relief. Each of these claims concerns prospective relief that would force defendants to meet their statutory obligations concomitant to their trust duty of providing an accounting. In this initial phase, plaintiffs first seek a declaration "construing the trust obligations of defendants to the members of the class [and] declaring that defendants have breached, and are in continuing breach of, their trust obligations to such class members." Plaintiffs' Complaint, Prayer for Relief ¶ 2. Second, plaintiffs request injunctive relief enjoining defendants from continuing to breach these duties and compelling defendants to perform these legally mandated obligations. *See id.* Third, plaintiffs ask for "a decree restraining and enjoining defendants ... from further hindrance or interference with the Special Trustee in the carrying out of his statutory duties, and directing them to cooperate with the Special Trustee and facilitate his performance of his statutory duty." *Id.* ¶ 3. The second phase of this suit concerns plaintiffs' claim for an accounting, which is their ultimate goal in this case and unambiguously provided for by statute. *See id.* ¶ 4. Plaintiffs have not stated a claim for money damages. *See Cobell,* 30 F.Supp.2d at 39–40.

It is the first phase—specific, non-monetary relief that would prospectively force defendants to come into compliance with their obligations concomitant to their duty to render an accounting—that is presently made the basis of defendants' motions for summary judgment.[8] To prevail on their motions, the competent summary judgment evidence must show that there is no genuine issue of material fact and that defendants are entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). This standard has not been met as to any of plaintiffs claims. Accordingly, defendants' motions will be denied in all respects.

## II. *Defendants' Consolidated Motion for Summary Judgment*

Defendants' Consolidated Motion for Summary Judgment seeks judgment as a matter of law on three items: (1) "common-law" breach of trust claims; (2) plaintiffs' claims that the Secretary of the Inte-

§ 702 *et seq.*) and "non-statutory" (*i.e.,* non-APA) review. *See Cobell,* 30 F.Supp.2d at 33. The APA provides for judicial review of agency action and the applicable waiver of sovereign immunity in actions for relief other than money damages that state claims that a federal officer acted or failed to act as required in an official capacity. *Rowe v. United States,* 633 F.2d 799, 801 (9th Cir.1980). The APA states that a reviewing court may "compel agency action unlawfully withheld" and "hold unlawful and set aside agency action ... found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or action "short of statutory right." 5 U.S.C. § 706(1), (2)(A), & (2)(C). Section 706(1) clearly "applies to the situation where a federal agency refuses to act[,] in disregard of its legal duty to act." *EEOC v. Liberty Loan Corp.,* 584 F.2d 853, 856 (8th Cir.1978). If a federal official has failed to discharge a duty that Congress intended the official to perform, then a court can compel performance of that duty and effectuate the mandate's purpose. *Carpet, Linoleum, and Resilient Tile Layers, Local Union*

*No. 419 v. Brown,* 656 F.2d 564, 566 (10th Cir.1981). A claim for equitable, non-monetary relief that is based on a right conferred by statute may be heard in federal district court, as opposed to the United States Court of Federal Claims, under the APA. *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967 (D.C.Cir. 1982).

8. An accounting cannot be performed, of course, without the pertinent underlying information. This information is contained in documents and computer files. Without the preservation and accessibility of these documents and files, defendants will not be able to render an accounting. *See* GEORGE T. BOGERT, TRUSTS § 140 (6th ed. 1987) ("In order that he may be able to present to the court and the beneficiaries an accurate history of his administration, the trustee is under a duty to retain trust documents, to secure and file vouchers for expenditures, and to keep records. Failure to perform his duties may cause the court considering his accounts to resolve doubts against him and otherwise to discipline him.")

rior has "obstructed" the Special Trustee's discharge of his duties; and (3) plaintiffs' requests for an injunction ordering defendants to carry out their trust duties. The court rejects all three of these contentions for the purposes of summary judgment.

### A. "Common–Law" Breach of Trust

Defendants argue that Congress has not subjected federal agencies to actions seeking common law remedies for breaches of trust and, therefore, judgment must be granted against plaintiffs on these claims. Additionally, defendants contend that, even if such remedies were otherwise available, they would be precluded by the availability of a "Tucker Act damages remedy" for breach of trust. These arguments misconstrue the basis for plaintiffs' claims, misinterpret the controlling law, and are therefore without merit.

### 1. Introduction

■■■ To bring a claim against the United States or its officials, as a general matter, plaintiffs must show that Congress has waived sovereign immunity for plaintiffs' cause of action, that Congress has created substantive rights on which to base plaintiffs' claims, and that a proper remedy is available. *See Hill v. United States,* 571 F.2d 1098, 1102–03 (9th Cir. 1978). Congress has waived defendants' sovereign immunity for plaintiffs' breach of trust claims. The system at issue—the IIM trust—is indeed a statutorily created trust. As the controlling Supreme Court case law on point clearly provides, the establishment of this trust creates certain substantive rights in favor of its beneficiaries, the plaintiffs, and violations of these rights by actions taken or not taken by federal officials may be remedied by prospective relief. The rights and remedies at issue, viewed in light of the common law of trusts, are within the government's

waiver of sovereign immunity. Therefore, plaintiffs have established substantive rights against the government, potentially appropriate remedies, and an applicable waiver of sovereign immunity. Defendants' arguments do not affect these conclusions and are, at any rate, without merit. For these reasons, defendants' legal grounds for summary judgment on plaintiffs' breach of trust claims must be rejected.

### 2. Section 702 Waiver of Sovereign Immunity[9]

■■■ Contrary to defendants' position, Congress has subjected defendants to the full range of relief that plaintiffs seek, in terms of sovereign immunity. Plaintiffs correctly point to 5 U.S.C. § 702 as the applicable waiver in this case. *See Cobell,* 30 F.Supp.2d at 31. Section 702 states:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States.

5 U.S.C. § 702. The case law from the Court of Appeals for the District of Columbia Circuit construing § 702 is clear. First, "issues of sovereign immunity in the context of injunctive relief against federal officers of the United States must be resolved with reference to § 702." *Cobell,* 30 F.Supp.2d at 31 (citing *Schnapper v. Foley,* 667 F.2d 102, 108 (D.C.Cir.1981)). Second, § 702 "retains the sovereign immunity defense in actions for injunctive relief only when another statute expressly or implicitly forecloses equitable relief," which is not the case in this lawsuit. *Id.* at 31 & n. 8 (citing *Schnapper*'s recognition of the legislative history of § 702: "[T]he

9. The court explained the doctrine of sovereign immunity in relation to plaintiffs' claims when it denied defendants' motion to dismiss. *See Cobell,* 30 F.Supp.2d at 30–32. As explained below, the legal grounds underlying

that holding subsequently have been affirmed by a recent decision of the United States Supreme Court. *See Department of the Army v. Blue Fox, Inc.,* —— U.S. ——, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999).

time [has] now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity;" and that § 702 was intended "to eliminate the defense of sovereign immunity with respect to any action in a court of the United States seeking relief other than money damages and based on the assertion of unlawful action by a Federal officer." (quoting S.Rep. No. 966, 94th Cong., 2d Sess., at 2, 7–8)). Third, "[t]he § 702 waiver of sovereign immunity in actions seeking relief other than money damages against the government also applies to claims brought outside the purview of the APA, such as some of the claims involved in the case at bar." *Cobell,* 30 F.Supp.2d at 31 (citing *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1328 (D.C.Cir.1996); *Clark v. Library of Congress,* 750 F.2d 89, 102 (D.C.Cir.1984); *Dronenburg v. Zech,* 741 F.2d 1388, 1390 (D.C.Cir.1984); *Schnapper,* 667 F.2d at 108; *Sea–Land Serv., Inc. v. Alaska R.R.,* 659 F.2d 243, 244 (D.C.Cir.1981); S.Rep. No. 966, 94th Cong., 2d Sess., at 2).

After recounting these well-settled principles, the court went on to hold that plaintiffs' action for prospective relief, entirely declaratory and injunctive in nature, "is an action for relief 'other than money damages.'" *Cobell,* 30 F.Supp.2d at 32. Thus, under the plain language of § 702, and in addition to the legislative history and case law interpreting § 702, the court found that plaintiffs' prospective claims could not be dismissed on sovereign immunity grounds.

In *Blue Fox,* the Supreme Court reaffirmed the proposition that "the crucial question under 702 is not whether a particular claim for relief is 'equitable,' . . . but rather what Congress meant by 'other than money damages.'" *Blue Fox,* 119 S.Ct. at 691. As the Court explained, the answer to this determinative question depends upon whether plaintiffs' claims are for "specific relief"—which would bring them within § 702's waiver—or whether plaintiffs actually seek "compensatory, or substitute, relief," which would not fall under § 702 by its terms. *Id.* The Court ultimately held that the relief sought by plaintiffs in that case, an equitable lien, was compensatory in nature. Nonetheless, the Court confirmed that as long as plaintiffs seek relief other than money damages (and the rest of § 702 is satisfied), § 702 waives the government's sovereign immunity for such claims.

■ There can be no dispute that plaintiffs' claims for declaratory and injunctive relief are not claims for money damages or substitute, compensatory relief. The court has already so held, and defendants do not take issue with that basic proposition here. The overwhelming line of controlling case law on point holds that defendants' sovereign immunity in the context of this case is simply not an issue as long as plaintiffs do not seek money damages. As discussed above, § 702 has never been held to be further limited; by its terms, § 702 looks to the relief sought, not the substantive right creating the cause of action. Therefore, because plaintiffs seek relief other than money damages, the sovereign immunity analysis is finished.

■ Defendants refuse to acknowledge this basic and clear proposition. Instead, they attempt to spin snippets of language lifted from various cases to lead to their desired conclusion that § 702 "does not encompass a common law action to enforce trust duties, oversee management of the IIM system, appoint a receiver, or remove the agency trustee." Defendants' Consolidated Motion at 10. Defendants' argument misses the point. To the extent that defendants are complaining that plaintiffs are asserting a purely "common law" cause of action for breach of trust and that no such cause of action exists, this contention fails. *See infra* sections II(A)(3)–(4). But that argument should not be confused with the § 702 analysis. Section 702's only role in this litigation is that it serves as the applicable waiver of defendants' sovereign immunity. Section 702 "simply waives

sovereign immunity as to all non-monetary claims against government agencies, officers, or employees covered by the Administrative Procedure Act, but [it] does not purport to grant any substantive rights." *Hill,* 571 F.2d at 1102 n. 7. The § 702 analysis does not turn upon whether an action arises under the common law or from statutes, and no court has ever held to the contrary. The only question in terms of sovereign immunity, assuming plaintiffs' action states a claim that an agency officer acted in an official capacity, is whether plaintiffs seek relief "other than money damages." Defendants wish to somehow narrow this rule, thereby excluding themselves from the declaratory and injunctive, specific, non-substitute relief sought by plaintiffs. There is no support for such an approach. Plaintiffs seek relief allowed under § 702 and, therefore, defendants' interpretation of § 702 is rejected.

### 3. *Establishment of IIM Trust Rights*

■ Defendants next raise a panoply of arguments that boil down to the contention that plaintiffs cannot bring a "common law" action to compel compliance with fiduciary duties stemming from the IIM trust that would force defendants to come into compliance with their statutory duty to render an accounting. Defendants admit that non-statutory review, outside of the Administrative Procedure Act, encompasses violations of rights granted by statute. Defendants' Consolidated Motion at 12. Apparently it is the pure "common-law" component with which defendants quarrel. As explained below, plaintiffs' claims, as those in *United States v. Mitchell ("Mitchell II")*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), *are* based upon statutory law. Consequently, defendants' arguments on this point miss the mark.

Plaintiffs have substantive rights, and defendants have corresponding duties, arising from the establishment of the IIM trust. Those fiduciary duties arise from the full responsibility given to defendants by the statutes applicable to the IIM trust, in addition to the complete control given to defendants over the plaintiffs' money in the IIM system. The basic contours of defendants' fiduciary duties under this trust are established by the statutes and, as in *Mitchell II,* construed in light of the common law of trusts. There can be no dispute that the basic "contour" involved in this case is defendants' duty to render an accounting. *See* 25 U.S.C. § 162a(d). In this regard, the government's conduct, "as disclosed in the acts of those who represent it in dealings with the Indians[,] should ... be judged by the most exacting fiduciary standards." *Seminole Nation v. United States,* 316 U.S. 286, 296–97, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942).

In terms of the creation of substantive rights, the case currently before the court is largely controlled by *Mitchell II*. In *Mitchell II,* individual allottees filed suit in the Court of Claims seeking to recover money damages from the United States for alleged breaches of trust. In that case, the trust relationship at issue was the management of timber lands on plaintiffs' reservation. Plaintiffs alleged that the government had failed to act as a reasonable trustee by not obtaining a fair market value for the timber the government sold, not managing timber on a sustained-yield basis, not obtaining any payment for some merchantable timber, not developing a proper system to access timber operations, not paying the proper interest on timber sales, and exacting excessive administrative fees from the beneficiaries. The government's waiver of immunity, because plaintiffs sought money damages in the Court of Claims, was based on the Tucker Act, 28 U.S.C. § 1491.

The Court ultimately held that the statutes and regulations before it "clearly [gave] the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish[ed] a fiduciary relationship and define[ed] the contours of the United States' fiduciary responsibili-

ties" to the individual Native American plaintiffs. *Mitchell II*, 463 U.S. at 224, 103 S.Ct. 2961. In addition to this statutory basis, the Court went to great lengths to emphasize the role of comprehensive control over Indian monies and property:

[A] fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds). [W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statutes (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Id.* at 225, 103 S.Ct. 2961 (second alteration in original) (citation omitted). Based upon these findings, the court held that the fiduciary duties arising out the timber-trust were established, thereby providing the allottee-beneficiaries a cause of action and a remedy against the government. *Id.* at 224–28, 103 S.Ct. 2961.

The same statutorily based relationship of comprehensive control exists as to the IIM trust involved in this case. The court has already described the comprehensive control given to the federal government by statute over the IIM trust. *See supra* Part I. Plaintiffs ultimately focus on one of the government's well-established duties— the duty to render an accounting. Setting aside for the moment all of the other statutes giving the federal government pervasive control of the IIM trust, the seven specific provisions of the 1994 amendments to § 162a provide the government with full responsibility for discharging its "trust responsibilit[y]" to render an accounting. 25 U.S.C. § 162a(d)(1) –(7). Although the

court has bifurcated the proceedings in this case, and it is the prospective prong of plaintiffs' action that is now being examined, it must be remembered that the two halves are still connected. Plaintiffs' ultimately seek an accounting, which defendants are indebted by statute to give to plaintiffs. Plaintiffs' requests for injunctive relief are merely incident to this statutorily provided right and seek to prospectively force defendants into compliance with this obligation.

This court is certainly not the first to notice the comprehensive federal control over IIM moneys. The Supreme Court itself recognized this point in *Mitchell II* when it stated that "[t]he pattern of pervasive federal control evident in the area of timber sales and timber management *applies equally . . . to management of Indian funds.*" *Mitchell II*, 463 U.S. at 225 n. 29, 103 S.Ct. 2961 (emphasis added). The Court cited 25 U.S.C. § 162a, even before the enactment of 1994 amendments, as the emblem of pervasive federal control over the management of Indian funds. *See id.* at 222 n. 24, 103 S.Ct. 2961. Surely the 1994 amendments have done nothing but create clearer responsibilities on behalf of the federal government as to these funds. Even the government admits that: (1) "[b]y statute, the Secretary of the Interior is responsible for leasing the plaintiffs' land, collecting and managing the income, and distributing the income to the individual Indian beneficiaries." Department of the Treasury's Motion at 5.(2) "The comprehensive statutory scheme designates the Secretary of the Interior as trustee and assigns specific trust duties" to the government. *Id.* at 12.(3) "The Secretary of the Interior has 'control or supervision' over IIM trust funds." *Id.* at 13.(4) "The overall statutory scheme gives 'comprehensive' authority to the Secretary of the Interior." *Id.* at 14.(5) "The legislative history supports the statutory language assigning the trust responsibility of the United States with respect to the IIM trust fund to the Secretary of the Interi-

or." *Id.* at 15. Although defendant Rubin's statements incorrectly posit that it is only the Secretary of the Interior, as opposed to the federal government, that is burdened by these fiduciary responsibilities, the court agrees with defendant Rubin that comprehensive control has been given to the United States by statute.

In summary, the fiduciary relationship that serves as the basis of plaintiffs' breach of trust claims is grounded in and defined by statute and has arisen from the pervasive, complete federal governmental control of plaintiffs' IIM funds. As with any trust, the beneficiaries are entitled to an accounting. In the context of the IIM trust, because it is a statutory trust, this duty has been established by Congress. As discussed more fully below, incident to the trust relationship and their right to an accounting, plaintiffs are entitled to seek injunctive and declaratory relief to secure the rights given to them by Congress, viewed in light of the area of law in which Congress was legislating—the common law of trusts.[10] For these reasons, defendants' motion for summary judgment on plaintiffs' breach of trust claims will be denied.

### 4. *Breach of Trust Remedies*

 Defendants contend that plaintiffs are not entitled to common law remedies such as injunctive and declaratory relief because such an allowance would be tantamount to the creation of a new body of federal common law. Furthermore, defendants argue that such remedies cannot be allowed because they would conflict with the 1994 Indian Trust Fund Management Reform Act, 25 U.S.C. § 162a. Neither logic nor the case law supports defendants' position; to the contrary, both point toward the availability of these remedies. Accordingly, defendants' arguments on these points will be rejected.

With the exception of the removal of the government as trustee, plaintiffs are entitled to seek standard common law remedies for breach of their IIM trust rights.[11] The court has already explained that the IIM trust and the specific duty to render an accounting have been established by virtue of statute and complete federal control over the IIM fund. It naturally follows that certain concomitant fiduciary duties are created. The controlling case law clearly provides that plaintiffs may seek prospective redress for breaches of these duties through common law remedies such as an injunction and declaratory relief, with the ultimate goal being the rendering of an accounting.

The logic of *Mitchell II* shows that the common law remedies typically available in breach of trust cases are available to plaintiffs. Although in *Mitchell II* plaintiffs sought an entirely different remedy, money damages, the basic principles announced in that decision control this case. After finding the existence of a trust, the Supreme Court stated that the statutes and regulations before it could be "clearly interpreted" as providing a damages remedy. *Mitchell II*, 463 U.S. at 226, 103 S.Ct. 2961. More specifically, the Court held that:

> [g]iven the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties. It is

---

**10.** Even the dissenters from the majority's opinion in *Mitchell II*, Justices Powell, O'Connor, and (then-Associate Justice) Rehnquist, assumed that the majority's opinion mandated that "the law of trusts generally will control and that all defenses to actions on breaches of trust, such as consent by the beneficiary and laches, will be fully available to the United States." *Mitchell II*, 463 U.S. at 237 n. 11, 103 S.Ct. 2961 (Powell, Rehnquist, O'Connor, JJ., dissenting). It should be noted that the basis for this dissent turned on

a disagreement about implying a money-damages remedy, which is not an issue in this case.

**11.** These remedies are embodied in Restatement (Second) of Trusts § 199 (1957). Plaintiffs cannot (and do not) seek money damages in this court for jurisdictional reasons. Moreover, the appropriateness of any given remedy will depend upon the facts proved at trial.

well established that a trustee is accountable in damages for breaches of trust. *See* RESTATEMENT (SECOND) OF THE LAW OF TRUSTS §§ 205–212 (1959); G. BOGERT, THE LAW OF TRUSTS & TRUSTEES § 862 (2d ed.1965); 3 A. SCOTT, THE LAW OF TRUSTS § 205 (3d ed.1967).

*Id.*

Simply put, it is just as clear that a beneficiary of a trust may turn to injunctive and declaratory remedies, as opposed to money damages, to have the trustee compelled to carry out its trust duties.[12] Section 199 of the *Restatement (Second) of Trusts* summarizes the common law as providing for at least five equitable remedies, which include a declaratory action to establish the duties of the trustee, an injunctive action to enjoin a breach of trust, and an injunctive action for specific performance to compel compliance with trust duties:

The beneficiary of a trust can maintain a suit

(a) to compel the trustee to perform his duties as trustee;

(b) to enjoin the trustee from committing a breach of trust;

(c) to compel the trustee to redress a breach of trust;

(d) to appoint a receiver to take possession of the trust property and administer the trust;

(e) to remove the trustee.

RESTATEMENT (SECOND) OF TRUSTS § 199 (1957). Other treatises restating common-law trust doctrine universally provide for the availability of these remedies. *See generally* GEORGE T. BOGERT, TRUSTS §§ 153–160 (6th ed.1987); 3 AUSTIN WAKEMAN SCOTT, THE LAW OF TRUSTS § 199 (1967). Therefore, given the existence of the IIM trust relationship, it naturally follows that plaintiffs should be able to enforce through injunctive and declaratory relief standard fiduciary duties directly concomitant to the rights given to them by Congress.[13] It would indeed be an odd state of the law if the beneficiaries of this established trust could not seek legal redress to compel the trustee to act in accordance with the laws set out by Congress.

The idea of plaintiffs seeking prospective remedies against the government for breach of the IIM trust is not a novel proposition. In fact, it was mentioned by the Court in *Mitchell II*, apparently with the Court's and the government's approval:

Absent a retrospective damages remedy, there would be little to deter federal officials from violating [plaintiffs'] trust duties, *at least until the allottees managed to obtain a judicial decree against future breaches of trust.... The Government contends that violations of duties imposed by the various statutes may be cured by actions for declaratory, injunctive or mandamus relief against the Secretary, although it concedes that sovereign immunity might have barred such suits before [the passage of APA § 702].*

12. The availability of a money damages remedy does not preclude the beneficiaries from seeking equitable remedies for a continuing breach of trust. *See* RESTATEMENT (SECOND) OF TRUSTS §§ 198 ("Although the beneficiary can maintain an action at law against the trustee ... he has also equitable remedies against the trustee.") & 199 ("The beneficiary of a trust can maintain a suit to compel the trustee to perform his duties as trustee. It is immaterial that there is an adequate remedy at law.")

13. Importantly, the case now before the court is much more straightforward than *Mitchell II*. In *Mitchell II*, the issue involved was whether a money damages remedy could be implied from the existence of the trust relationship and the statutes creating that relationship. In the case before this court, the ultimate remedy sought by plaintiffs—an accounting—is already provided for by statute. *See* 25 U.S.C. § 162a(d). The prospective remedies sought by plaintiffs would simply force the government to carry out their obligations in such a manner as to meet this ultimate obligation. Therefore, defendants' argument that the court would somehow be expanding existing law by allowing plaintiffs to seek injunctive and declaratory relief is unmeritorious.

*Mitchell II*, 463 U.S. at 227, 103 S.Ct. 2961 (emphasis added). Thus, it appears that both the Court and the government would have allowed the prospective remedies sought by plaintiffs in that case. Of course, the government had no problem accepting this position in *Mitchell II* because the equitable jurisdiction required for such prospective remedies did not lie in the Court of Claims, as it does with this court. *See Lee v. Thornton*, 420 U.S. 139, 140, 95 S.Ct. 853, 43 L.Ed.2d 85 (1975) (per curiam) (holding that the Tucker Act "allows the Court of Claims to award damages but not to grant injunctive or declaratory relief"); *Richardson v. Morris*, 409 U.S. 464, 465, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973) (per curiam) (stating that the Court of Claims has no power to grant equitable relief). Once plaintiffs' case was filed before this court, where these prospective remedies could be sought without legitimate jurisdictional issue, the government took the position that only a retrospective remedy was available, and such a case would need to be brought in the United States Court of Federal Claims. *See Co-*

*bell*, 30 F.Supp.2d at 38–39 & 39 n. 19. Despite the government's shifting defenses, the message from the Supreme Court is clear: prospective remedies such as injunctive and declaratory relief are allowed for breaches of an established trust with rights defined by statute, such as the IIM system.[14]

The conclusion that these remedies and their underlying rights must be construed in light of the common law of trusts is established by the applicable case law. First, as mentioned above, even the dissenting Justices in *Mitchell II* acknowledged that the general common law of trusts would apply to plaintiffs breach of trust claims under the reasoning of the majority opinion. *See supra* note 9. Second, *Nevada v. United States*, 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983), decided three days before *Mitchell II*, strongly supports the proposition that although the government stands in a different position as a private fiduciary in some necessary respects, the common law of trusts must generally inform plaintiffs' breach of trust claims in this case.[15] In

**14.** The government attempts to obfuscate this proposition by noting that the Court found plaintiffs' prospective remedies in *Mitchell II* to be "totally inadequate" on the facts of that case. The conclusion drawn by defendants is that this language somehow limited the prospective remedies available to plaintiffs. But a full reading of the case shows exactly to the contrary. The breach of trust complained of in *Mitchell II* was the mismanagement of timberlands, *i.e.*, mismanagement of the trust corpus. There were two reasons that prospective relief would not have, in practice, remedied the mismanagement at issue in that context. First, "the Indian allottees were in no position to monitor federal management of their lands." *Mitchell II*, 463 U.S. at 227, 103 S.Ct. 2961. Second, "by the time government mismanagement [of the timber became] apparent, the damage to Indian resources may [have been] so severe that a prospective remedy [would have been] next to worthless." *Id.* In short, the Court was simply recognizing the reality of the situation as to the trust corpus management. The beneficiaries could not be expected to know when to file for prospective relief and, when they did, it would likely be too late because the land would have been logged. The Court, of

course, could not have prospectively ordered that the laws of nature be reversed or that the trees be regrown at whatever rate it chose. In that context, the Court found prospective remedies to be inadequate. Thus, the government's argument that by its "inadequacy" comment the Court intended to narrow the scope of available prospective remedies is unpersuasive since that comment was based on a factor not at issue in this case—natural resources management. Moreover, even if the Court's language could be stretched to embody defendants' interpretation, there is no reason to believe that the inadequacy of a prospective remedy is tantamount to the unavailability of such a remedy. For these reasons, defendants' interpretation of *Mitchell II* as to prospective remedies is rejected.

**15.** Given the Court's holding in *Nevada*, plaintiffs' general theme in responding to defendants' summary judgment arguments is flawed. Plaintiffs cannot simply announce that this is a "trust case" and therefore conclude that the government owes all typical trust duties under the common law. Such an approach oversimplifies the role of the common law of trusts in this case and misconstrues *Mitchell II*, in light of *Nevada*. For this

*Nevada,* the issue before the court was whether an Indian tribe and a water-reclamation-project organization were bound under res judicata by a previous judicial decree. *See id.* at 134, 103 S.Ct. 2906. The prior judgment at issue involved a case in which the United States had brought suit on behalf of both the Indian tribe and the organization. The government took this action because it was bound to represent the rights of the Indian tribe and was also required to obtain water rights for reclamation projects. *Id.* at 128, 103 S.Ct. 2906. The court of appeals held that the government had compromised its duty of undivided loyalty, borrowed from the common law of trusts, and the tribe was therefore not bound by the judgment insofar as the interests of the tribe and the reclamation project's landowners were concerned. *Id.* at 141, 103 S.Ct. 2906. The Supreme Court reversed on this point, holding that this rule of common-law trust doctrine, the duty of undivided loyalty, could not apply in that context since "the Government is simply not in the position of a private litigant or a private party under traditional rules of common law or statute." *Id.* Specifically, the court held that the government was tasked with the duty of representing both the tribe and the water reclamation project. *Id.* at 128, 103 S.Ct. 2906. It would have been "simply unrealistic to suggest that the Government may not perform its obligation to represent Indian tribes in litigation when Congress has obliged it to represent other interests as well." *Id.* In short, one standard duty of a trustee under the common law of trusts did not logically apply to the government as trustee on that point. Importantly, however, the Court also discussed the consequences of *Nevada* for

cases between the government and the tribe, which is closely analogous to the case now before the court. Specifically, the Court stated:

> It may well be that where only a relationship between the Government and the tribe is involved, the law respecting obligations between a trustee and a beneficiary in private litigation will in many, if not all, respects, adequately describe the duty of the United States.

*Id.* at 142, 103 S.Ct. 2906. The scenario contemplated by the Court—a lawsuit based upon the trust relationship between Native Americans and the government—is now before this court. The Court's language points to the conclusion that the common law of trusts generally informs these breach of trust cases, as the Court so held three days later in *Mitchell II.*[16] Third, the idea of construing governmental fiduciary duties in light of the common law is not limited to Native American trust law. In *Hughes Aircraft Co. v. Jacobson,* —— U.S. ——, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999), the Court recognized that, in the context of ERISA litigation, "trust law may offer a 'starting point' for analysis in some situations." *Id.* at 765. Although the court rejected the invocation of common law principles in that case and warned that such principles must "give way" if they are inconsistent with ERISA's language, structure, or purposes, *see* 29 U.S.C. § 1002, the Court nonetheless explicitly left open the possibility that common law principles may come into play with a statute as comprehensive as ERISA. Therefore, even aside from the clear mandate of *Mitchell II,* the court holds that it must view defendants' trust duties in light of the area of law governing

reason, the court does not conclude today that any given duty is placed on the government solely as a result of the establishment of the IIM trust, in the absence of express duties placed on the government by Congress or concomitant duties arising thereunder.

16. The Court has looked to basic common law trust principles when analyzing other Indian breach of trust issues. *See United States v.*

*Dann,* 470 U.S. 39, 48–50, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985); *Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942) (both recognizing the "traditional rule" that a debtor's payment to a fiduciary of the creditor satisfies the debt in the trust context, and both citing *Bogert* § 901 for this rule of law).

such relationships—the common law of trusts.

The court's recognition of the availability of these substantive rights and remedies, created by statute and informed by the common law, does not create a new body of federal common law. *Mitchell II* clearly held that the Native American trust in issue, established by statute and the pervasive federal control over the Native American lands, placed certain fiduciary duties upon the government. The court looked to the common law of trusts in interpreting the statutes and regulations at issue to infer a money damages remedy. Other cases, as discussed, buttress such an approach. In this case, the establishment of the trust is just as clear as *Mitchell II*; indeed, the court even made reference to the equal applicability of their statements as to the government's handling of Native American monies. The ultimate remedy at issue is even clearer, for it is provided by statute. The prospective remedies that plaintiffs now seek are merely incidental to this ultimate remedy, and these remedies were clearly contemplated by the Court and advocated by the government, in that case. To imply that this court is somehow creating a new body of federal common law is simply incorrect.

Congress has not legislated in a manner inconsistent with the case law that has developed on these points, and it has not provided remedies contrary to those typically available under a common law breach of trust action, except to the extent that removal of the trustee is involved.[17] Congress has stated that defendants must provide plaintiffs with an accounting of the IIM trust. *See* 25 U.S.C. § 162a(d). Defendants point to that legislation and claim that it is the only remedy provided by Congress and any further remedy is therefore inconsistent. This argument fails. First, it is disingenuous to argue that the Indian Trust Fund Management Reform Act was intended to preclude other remedies. The language of the statute itself indicates that the fiduciary duties listed, such as the provision of an accounting, should not be taken as exhaustive. *See* 25 U.S.C. § 162a(d) ("The Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following....."). Second, the prospective remedies sought by plaintiffs are merely tools to reach the end of the statutorily provided remedy. As defendants have shown over the course of history, Congress's simple demand of an accounting does not lead to that result. There are steps along the way that must be taken, such as the retention of trust documents, that are required to reach an accounting. Forcing the government to take basic measures to reach their legal duty of giving plaintiffs an accounting can hardly be said to be inconsistent with Congress's demand that an accounting be given.[18]

In conclusion, the controlling case law on point leads this court to find that plaintiffs have prospective remedies against the government. These remedies, as well as the underlying substantive rights, must be

---

17. Just as application of the common law "undivided loyalty" principle was unrealistic and inapplicable in *Nevada,* a request for the removal of the government as trustee would also be inapplicable. Congress has clearly provided that the government is to act as trustee for the IIM monies. This court does not have the power to encroach upon that decision, as such action would violate the doctrine of separation of powers. Congress has created this trust, and only Congress may alter it. This court's duty, as in all other cases, it to interpret and judicially enforce these laws.

18. The court recognizes that one available remedy, putting the trustee into receivership, more clearly implicates separation of powers concerns. The court is well aware of this issue and intends to ensure that it does not overstep its bounds. There is case law pertaining to when it is appropriate to put a trustee or a governmental agency into receivership. Plaintiffs do not even make the receivership request at this time. It is simply too early to exclude the possibility of receivership at some point in the future, even if it would be currently inappropriate.

construed in light of the common law of trusts. The court's recognition of these rights and remedies does not violate the doctrine of separation of powers or create a new body of federal common law. Therefore, defendants' arguments concerning plaintiffs' prospective remedies will be rejected.

### B. *Obstruction of the Special Trustee*

In Count One of their Complaint, plaintiffs allege that they "are entitled to an order in the nature of a writ of mandamus" to prevent the Secretary of the Interior from obstructing the Special Trustee from discharging certain duties. Plaintiffs' Complaint ¶ 39. To receive a writ of mandamus, plaintiffs must show that defendants' "duty to be performed is ministerial and the obligation to act peremptory, and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable." *U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420, 51 S.Ct. 502, 75 L.Ed. 1148 (1931). For such a ministerial duty to be found, it must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218–19, 50 S.Ct. 320, 74 L.Ed. 809 (1930). The court will deny defendants' motion.

Plaintiffs have claimed seven acts of obstruction. In their Complaint, plaintiffs allege that the following actions provide them a basis for their cause of action: (1) defendants' failure to reprogram funds toward the discharge of the Special Trustee's duties; (2) defendants' refusal to request adequate funds for the Special Trustee's work; (3) defendants' interference with the Special Trustee's preparation of his Strategic Plan; (4) defendants' refusal to permit the Special Trustee to conduct the technology and use survey necessary to carry out his duties; (5) defendants' preclusion of meetings of the Ad-

visory Board of the Special Trustee; and (6) defendants' refusal to permit the Special Trustee to employ adequate staff and expert consultants necessary to carry out his duties. Although plaintiffs have not yet amended their Complaint to formally include their seventh and final claim, they have charged defendant Babbitt repeatedly before this court and in their opposition to summary judgment with the "crowning act of obstruction"—defendant Babbitt's re-organization of the Office of the Special Trustee. *See* Plaintiffs' Reply to Defendants' Consolidated Motion at 17–18; *see also supra* Part I & note 6 (discussing the re-organization of the Office of the Special Trustee by Secretary Babbitt).[19] Plaintiffs' third, fourth, and fifth claims are moot. The Special Trustee has prepared his plan, the Special Trustee has conducted the technology and use survey, and the Advisory Board has met regarding the Special Trustee's trust administration. Therefore, the court will not further address these claims. Thus, only three categories of claims remain: staffing claims, funding claims, and the charge arising out of the Office of the Special Trustee's re-organization.

The court will deny defendants' motion for summary judgment as to all of these claims. First, as is clear from the statute creating the Office of the Special Trustee and the legislative history behind it, Congress put OST in place to be independent from the problems plaguing the Department of the Interior and the officials that historically failed in bringing about the necessary changes. Put another way, the Office of the Special Trustee, and its congressionally created structure, was Congress's considered judgment as to how help try to solve the IIM administration problems. Defendant Babbitt's executive order which re-organized the OST, without the consent of Congress and without even conferring with the independent body that

---

19. The court will grant plaintiffs leave to amend their Complaint to properly include this charge, which is well-known to defen-

dants and discussed at length in their memoranda.

Congress had created, raises genuine issues of material fact as to whether this reorganization was an act contrary to the statute passed by Congress. *See* 25 U.S.C. § 4041 *et seq.* (Supp.1999). Therefore, defendants' motion will be denied in this regard.

■ Second, as to plaintiffs' staffing and funding claims, the court is not persuaded that no genuine issue of material fact exists or that defendants are entitled to judgment as a matter of law. It is true that staffing and funding matters are often purely within the discretion of federal officials. *See Lincoln v. Vigil,* 508 U.S. 182, 192–93, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (addressing the spending of lump-sum appropriations); *National Ass'n of Postal Supervisors v. United States Postal Serv.,* 602 F.2d 420, 432 (D.C.Cir.1979) (dealing with employee compensation rates). However, it is also true that federal officials cannot violate statutory directives, and surely the fact that these statutory directives implicate funding and staffing decisions does not allow federal officials to disregard statutory mandates. *See Lincoln,* 508 U.S. at 193, 113 S.Ct. 2024 ("Of course, an agency is not free simply to disregard statutory responsibilities."); *National Ass'n of Postal Supervisors,* 602 F.2d at 432 ("Courts can defer to the exercise of administrative discretion on internal management matters, but they cannot abdicate their responsibility to insure compliance with congressional directives setting the limits on that discretion.").

■ The statutory structure here is unique and distinguishable from a lump-sum appropriation scenario. First, it is not the spending of funds granted without congressional limitation that is in dispute. It is federal officials' failure to comply as a result of requesting inadequate funds that is at issue. Second, the statutory scheme specifically set-up by Congress placed several duties on the Special Trustee, including duties as to staffing and budgeting. *See* 25 U.S.C. §§ 4043(c)(5) & 4045(a).

The allegations raised by plaintiffs clearly charge that defendant Babbitt's actions in relation to these congressionally mandated functions prevented these duties from being effectively discharged. Plaintiffs have raised genuine issues of material fact, as evidenced by testimony at the contempt trial in this case, that defendant Babbitt failed to request and provide, under any range of reasonable discretion, adequate funding for staffing and the discharge of the Special Trustee's duties. *See Cobell,* 37 F.Supp.2d at 29–30 (highlighting the claims from Office of the Special Trustee officials, in addition to plaintiffs' allegations, that OST was severely underfunded). Although significant questions concerning defendant Babbitt's authority and range of discretion remain, the court is not willing to grant summary judgment on these issues. Therefore, defendants' motion for summary judgment as to plaintiffs' claims of obstruction of the Special Trustee will be denied.

### C. *Mandatory Injunctive Relief*

■ Defendants believe that they are entitled to summary judgment on "plaintiffs' requests for injunctive relief to impose particular changes in administration of the IIM system." This argument is based upon the application of basic "principles of equity jurisprudence." Defendants' Consolidated Motion at 42. Defendants contend that, based upon these principles that limit this court's equitable powers, it would be inappropriate to "grant the broad institutional relief" that plaintiffs seek. *Id.*

■ At the outset, it should be noted that defendants' contentions are grounded in the assumption that plaintiffs will ask this court, as the immediate result of the prospective trial, to announce what sorts of specific programmatic systems defendants must employ in order to reach their ultimate statutory duty of rendering an accounting. Defendants make this assumption based upon a comment made by

plaintiffs' counsel at a status hearing held over one year ago. But plaintiffs' Complaint does not, by its terms, seek such sweeping actions. Plaintiffs' Complaint, and nearly all of the discussion before this court, have involved their requests for an accounting, a declaratory judgment stating defendants' trust duties in relation to plaintiffs, an injunction enjoining defendants from breaching these specific duties, and a decree requiring defendants to come into compliance with their trust duties. The court has no present intention to entertain a request to sit as a pseudo-congressional oversight body that tells defendants everything that they must do to meet their obligations programmatically. That is a role that only Congress can fulfill. The court expects to declare the fiduciary obligations to plaintiffs and entertain requests for injunctive relief as they pertain to these broad duties arising under the statutes in light of the common law of trusts. This court has no choice but to recognize these limited, specific legal rights created by Congress in favor of plaintiffs and to enforce these rights accordingly. Although significant deference generally must be given to allow the executive branch to carry out its duties, the exercise of this discretion at a certain point is constrained by statutory limits and enforceable in the courts. *See Nader v. Saxbe*, 497 F.2d 676, 679 n. 19 (D.C.Cir.1974). "Just as the doctrine of the separation of powers forbids [the Court] to trespass on lawful agency discretion, so it requires the

agency to carry out faithfully its legislative charter." *Natural Resources Defense Council, Inc. v. Herrington*, 768 F.2d 1355, 1433 (D.C.Cir.1985). Moreover, as the Supreme Court has recognized, courts will "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 681, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). The issue of whether defendants have complied with a congressional mandate, signed into law by the President, is not a nonjusticiable political question. *See Covelo Indian Community v. Watt*, 551 F.Supp. 366, 378–79 (D.D.C. 1982).

The principles defendants rely upon in their request for summary judgment as to injunctive relief are: (1) lack of an irreparable injury; (2) unsuitability of injunctive relief; (3) availability of APA review; and (4) availability of a damages remedy. These arguments fail. First, such a ruling would be premature for equitable reasons. If this court decides that granting plaintiffs equitable relief would be appropriate, then it must "mold each decree to the necessity of the particular case." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The court must have the full record before it to determine what equity requires.[20] It may come to pass

---

**20.** The court recognizes that "[a]n action purportedly requesting a mandatory injunction against a federal official is analyzed as one requesting mandamus." *National Wildlife Federation v. United States*, 626 F.2d 917, 918 n. 1 (D.C.Cir.1980); *Cobell*, 30 F.Supp.2d at 36 n. 13. Although the court exercised its discretion in dismissing plaintiffs' prospective mandamus claim at the motion to dismiss stage, the court will not rule today that plaintiffs are precluded as a matter of law from seeking a mandatory injunction against defendants. As discussed above, the equitable remedies of injunction and specific performance are standard remedies in the law of private trusts. It is simply too early to say that plaintiffs would not be entitled to these remedies

no matter what is proven at the upcoming trial. General issues of material fact clearly exist as to whether defendants are in compliance with their trust duties, evidenced most easily by the fact that they cannot currently give plaintiffs an accounting. Of course, defendants are no doubt correct that a mandatory injunction against a federal official is an extraordinary, although not unprecedented, remedy. *See e.g., Samaritan Health Ctr. v. Heckler*, 636 F.Supp. 503, 518 (D.D.C.1985) (issuing mandamus against Secretary of Health and Human Services because "plaintiffs [had] a clear right to relief, the defendant [had] a clear duty to act, and there is no other adequate remedy available to plaintiffs.")

that mandatory injunctive relief would be inappropriate and that the court's orders would need to be fashioned in terms of negative injunctive and declaratory relief. *See, e.g., Natural Resources Defense Council v. Lujan,* 768 F.Supp. 870 (D.D.C. 1991) (holding that the issuance of a mandatory injunction against the Secretary of the Interior would be an unnecessarily "drastic" action on the facts of the case but granting declaratory judgment that Secretary failed to comply with legal duty and declaring that Secretary come into compliance on an "expedited basis"). Until the court knows the full range of facts and circumstances, however, such a ruling would be inappropriate. Second, defendants can point to no set of undisputed material facts that would support a ruling that injunctive relief would be inappropriate as a matter of law. The record clearly contains evidence that defendants cannot give plaintiffs an accounting and, relatedly, that they cannot account for many documents that would be required to perform such an accounting. Presumably plaintiffs will contend that these are breaches of fiduciary obligations. The prospective remedy for these breaches, if any, will depend on the necessity for injunctive relief, which will in turn depend on what is being done at the time of trial to remedy any breaches that are established. Thus, given these material facts that are, viewed even in the best light for defendants, disputed, defendants cannot point to a single set of undisputed facts that would support their request.

For these reasons, the court will deny defendants' request for summary judgment as to plaintiffs' requests for injunctive remedies. The requests made by plaintiffs in their Complaint and before this court are clearly in alignment with the rights that are available to them under the IIM trust. The court does not interpret plaintiffs' request to seek specific programmatic reforms. If plaintiffs request

Moreover, defendant Rubin admits that there is some genuine issue of material fact as to his performance of certain ministerial duties

such relief, then they will be forced to contend with defendants' arguments at that time. Until then, however, summary judgment as to plaintiffs' current requests would be premature and unwarranted.

III. *Defendant Secretary of the Treasury's Motion for Summary Judgment*

██ Defendant Rubin moves for summary judgment based on his contentions that no material facts are in dispute and that he is entitled to judgment as a matter of law on plaintiffs' prospective breach of trust claims against him. The court disagrees. Therefore, defendant Rubin's motion will be denied.

Plaintiffs allege in their Complaint that defendant Rubin "is custodian of the monies in the IIM accounts, is responsible for maintaining certain records in connection therewith, and has certain investment responsibilities with respect thereto." Plaintiffs' Complaint ¶ 15. In terms of the prospective component of this case, and therefore in terms of defendant Rubin's motion for summary judgment, plaintiffs focus strictly upon "the government['s duty] as trustee ... to maintain accurate and accessible trust records so as to assure the beneficiaries that their accounts are correct." Plaintiffs' Opp. at 1.

██ In prosecuting their prospective breach of trust action, plaintiffs "cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty." *Shoshone–Bannock Tribes v. Reno,* 56 F.3d 1476, 1482 (D.C.Cir.1995). "Without an unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts must appreciate that whatever fiduciary obligation otherwise exists, it is a limited one only." *Id.* Exactly such a federal trust responsibility exists in this case, and it applies, to a

concerning limited payability statutes. *See* Defendant Rubin's Reply at 2.

limited extent, to the Secretary of the Treasury.

Defendant Rubin, in his reply, concedes that genuine issues of material fact may exist as to his discharge of duties under the implementation of the limited payability statutes, 31 U.S.C. §§ 3328, 3334, & 3702(c). *See* Defendant Secretary of the Treasury's Reply at 2. Although this issue was brought to the attention of defendant Rubin a "few weeks" before his reply was filed, he did not "determine[ ] . . . to seek an independent review of this matter" until the day before his reply was filed. *Id.* At any rate, the government concedes that it has such a duty under the statutes and that it cannot be said that no genuine issue of material fact exists as to the discharge of these duties. Accordingly, summary judgment must be denied on this point.

But the limited payability statutes are not the only sources of duty for the Secretary of the Treasury, in terms of handling IIM trust administration. Section 162a(d) of the Indian Trust Fund Management Reform Act clearly and unambiguously provides that the United States, through the Secretary of the Interior, must provide an accounting to plaintiffs. *See* 25 U.S.C. § 162a(d) (providing that, to "proper[ly] discharge . . . the trust responsibilities of the United States," the Secretary of the Interior must, *inter alia*, (1) provide systems for accounting, controls over receipts and disbursements, and timely reconciliations; and (2) determine accurate cash balances). Congress has authorized the Secretary of the Interior to employ certain services of the Department of the Treasury in furtherance of carrying out the government's fiduciary obligations. *See* 25 U.S.C. §§ 161 & 161a. Section 161 allows "[t]he Secretary of the Interior . . . to deposit . . . all sums received on account of sales of Indian trust lands, and the sales of stocks lately purchased for temporary investment, whenever he is of the opinion that the best interests of the Indians will be promoted by such deposits . . . in the United States Treasury." Section 161a

provides that, as to "funds held in trust for individual Indians," "[a]ll funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of individual Indians shall be invested by the Secretary of the Treasury, at the request of the Secretary of the Interior." Thus, in carrying out the government's ultimate duty of managing the IIM trust fund and providing an accounting, the Secretary of the Interior may delegate certain functions—namely, the holding and investment of certain funds—to the Secretary of the Treasury.

In the process of carrying out these trust duties, the Department of the Treasury generates trust documents that are highly relevant to an accounting of the IIM system and, therefore, highly relevant to this litigation. The Department of the Treasury has demonstrated a clear inability to retain these documents, at least for the purposes of this litigation. *See* Report and Recommendation of the Special Master (filed this date). This problem, among other things, is what has led the Special Master to recommend the entry of a preliminary injunction against the Department of the Treasury to prevent the destruction of these important documents.

To the extent that the Department of the Interior has, with the authorization of Congress, delegated certain trust responsibilities to the Department of the Treasury, the Department of the Treasury cannot act contrary to Congress's mandate that plaintiffs be given an accounting of their trust funds monies. *See* 3 SCOTT, THE LAW OF TRUSTS, *supra*, § 224 (explaining that a beneficiary of a trust may sue a co-trustee for breaches of trust by that co-trustee). Plaintiffs allege that the Department of the Treasury has done just that by destroying these IIM-trust-related documents. Clearly there is evidence of this destruction in the record, as embodied by the Special Master's report discussed above and the Department of the Treasury's recent admissions that they "inad-

vertently" destroyed a large set of potentially relevant documents. Therefore, there are genuine issues of material fact as to whether defendant Rubin has acted in contravention of a trust duty placed upon the United States, which was to be carried out by the Secretary of the Interior, which was in turn delegated for a limited purpose to the Secretary of the Treasury. The court holds that the Secretary of the Treasury, in his role as trustee of the IIM trust for limited purposes authorized by Congress, has a duty to act as a proper trustee with trust-related documents, at least until an accounting has been given to plaintiffs, as mandated by Congress. The exact contours of this duty will be the subject of the impending trial. Accordingly, defendants' motion for summary judgment must be denied.[21]

## IV. *Conclusion*

For the reasons stated above, the court will order that:

1. Defendants' Motion for Summary Judgment on Plaintiffs' Claims Based Upon a Common Law Breach of Trust Theory, Claims.Based Upon Alleged Interference with the Office of Special Trustee, and Requests for a Mandatory Injunction will be DENIED.

2. Defendant Secretary of the Treasury's Motion [262] for Summary Judgment as to plaintiffs' prospective claims for relief will be DENIED.

A separate order shall issue this date.

### ORDER

For the reasons stated in the court's Memorandum Opinion issued this date, the court HEREBY ORDERS that:

1. Defendants' Motion for Summary Judgment on Plaintiffs' Claims Based Upon a Common Law Breach of Trust Theory, Claims Based Upon Alleged Interference with the Office of Special Trustee, and Requests for a Mandatory Injunction is DENIED.

2. Defendant Secretary of the Treasury's Motion [262] for Summary Judgment as to plaintiffs' prospective claims for relief is DENIED.

3. The pretrial conference shall proceed as scheduled at 2:00 p.m., Monday, June 7, 1999. Trial shall commence as scheduled at 10:00 a.m., Thursday, June 10, 1999.

SO ORDERED.

---

**21.** Even if the court were to accept defendant Rubin's argument that he owes no trust duties to beneficiaries in the handling of the trust fund monies, but the Secretary of the Interior owes all of these duties, under common-law principles, plaintiffs would be able to join the Secretary of the Treasury as a defendant at least in his capacity as agent of the Secretary of the Interior. *See* RESTATEMENT (SECOND) OF TRUSTS § 282 (1957); 4 SCOTT, THE LAW OF TRUSTS, *supra*, § 282.1, at 2339. But this issue need not be reached today because, as explained above, Congress has authorized and mandated that the Secretary of the Treasury take certain actions on behalf of the government in its role as trustee.